# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-2311

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

AMAD ZAMBRANA,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 CR 30196—**Michael J. Reagan**, *Judge.*

ARGUED SEPTEMBER 15, 2005—DECIDED OCTOBER 31, 2005

Before FLAUM, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The Government appeals the decision of the district court to grant Amad Zambrana's motion to suppress narcotics found in his rental car, as well as statements made by Mr. Zambrana and by Babar Shah, the car's passenger. For the reasons set forth in the following opinion, we vacate the decision of the district court and remand the case for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

At approximately 9:45 a.m. on April 18, 2002, Officer Mike Reichert, a patrolman for the City of Collinsville, Illinois, made a traffic stop on Interstate 55-70 that led to the arrest of Amad Zambrana and Babar Shah. Mr. Zambrana and Shah were later charged with possession of cocaine and heroin with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Mr. Zambrana filed a motion to suppress the seized narcotics and statements made by him and by Shah. He contended that the stop was without probable cause and that the subsequent search also was without probable cause.

The district court held a suppression hearing on March 8, 2004. Officer Reichert testified that he had taken classes on how to recognize pre- and post-stop indicators of drug activity and that he now teaches classes on those indicators for officers. He testified that, on the morning of April 18, he was turning around in the median of Interstate 55-70 at the 8-mile marker when he noticed a white Toyota with Maryland plates traveling eastbound. Officer Reichert observed that there was fresh damage on the driver's side of the car. Officer Reichert pulled out behind the Toyota. As he followed the vehicle, he noticed that it crossed the white center divider line on the roadway. He then pulled alongside the Toyota and noticed that the driver did not make eye contact with him. Officer Reichert testified that such a failure to make eye contact was unusual. He then resumed his position behind the Toyota and activated his red lights. In response, the driver of the Toyota pulled off the roadway. Officer Reichert, concerned about the safety of remaining in a position so proximate to a busy exit, instructed the driver

to move the car off the interstate into a nearby abandoned gas station parking lot.

Officer Reichert testified that Mr. Zambrana was driving the car and that the vehicle had been rented by a third party who was not present. The rental agreement listed Mr. Zambrana as an additional driver. The car had been rented on April 11, 2002 in Maryland, and the rental agreement only allowed the vehicle to be operated in Maryland, the District of Columbia, Virginia and South Carolina.[1] Officer Reichert testified that, when Mr. Zambrana gave Officer Reichert the rental paperwork and his driver's license, his hand was shaking badly. Officer Reichert also asked Shah, the passenger, for identification; Shah produced a military identification card. Officer Reichert testified that he thought it was odd that Shah had produced a military identification, and concluded that he was trying to present a "good guy" image.

Officer Reichert testified that, in his experience, drugs often are seized from rental cars rented by third parties who are not passengers in the vehicle. He also testified that, when he looked in the back of the car, he saw trash and maps, as well as one small overnight bag which was open and revealed clothing inside the bag. Officer Reichert testified that it was also common for drug couriers to have only a small piece of luggage with one change of clothes in the car.

Officer Reichert then asked Mr. Zambrana to exit the vehicle, and he observed that Mr. Zambrana was shaking nervously. Officer Reichert further testified that, when he

---

[1] The abbreviations "MD DC VA" are printed on the rental agreement, followed by the handwritten note "to SC." R.27 at 18.

asked Mr. Zambrana the purpose of the trip, Mr. Zambrana stated that he had gone to California to visit some friends who were in the armed forces and who were about to be deployed. Mr. Zambrana further stated that he had left Maryland on April 11 and had driven straight through to California. Officer Reichert testified he later asked Shah the purpose of their trip and that Shah stated that they had gone to California to sight-see and visit friends. Officer Reichert testified that he regarded these statements as inconsistent. The officer also stated that Shah seemed nervous; he would not make eye contact, and his voice was breaking. Officer Reichert testified that he then asked Shah and Mr. Zambrana if they had been arrested for anything. Shah replied that he had not and that he was a United States Marine; Mr. Zambrana replied that he had been arrested for simple assault.

Officer Reichert then ran warrant and driver's license checks on Mr. Zambrana and Shah. The officer testified that Mr. Zambrana had more of a criminal history than just an arrest for simple assault. He regarded the discrepancy as a sign of deception because, in his experience, people do not "down play" their record. R.41 at 25. While Officer Reichert was checking these records, Officer Chuck Mackin arrived on the scene as a backup officer.

Officer Reichert testified that, after running the checks, he told Mr. Zambrana that he would issue a warning for crossing the center line. He then asked Mr. Zambrana if he would speak with him for a few minutes; Mr. Zambrana agreed. Officer Reichert asked why both men were shaking visibly; Mr. Zambrana replied that they had been driving for a long time and were tired. Officer Reichert then asked Mr. Zambrana a series of "rolling no" questions, asking about illegal contraband to gauge his demeanor while

responding.[2] Tr. at 29. According to Officer Reichert, Mr. Zambrana answered "no" to each question, but, as he answered "no," he would break eye contact and look to the ground.

Officer Reichert testified that he then asked permission to search the car; Mr. Zambrana denied permission, telling the officer that he had been stopped four times on the trip. After this refusal, Officer Reichert informed Mr. Zambrana that he would be detaining the car for a canine sniff, but that Mr. Zambrana and Shah were free to leave. Officer Reichert testified that he informed Mr. Zambrana that it would take fifteen to twenty minutes for a dog to arrive; he added that the car probably could be searched in less time and, if nothing illegal was found, Mr. Zambrana could be on his way. Mr. Zambrana then gave permission to search and Officer Reichert began searching the car. The canine arrived a few minutes later while the officer was still searching the car. The dog began to sniff the car and alerted at the passenger-side dashboard. Officer Reichert then disassembled part of the center console and found a white plastic bag with white powder in it; this substance later tested positive for heroin and cocaine.

Officers Reichert and Mackin then arrested Mr. Zambrana and Shah and transported them to the police department. Both Mr. Zambrana and Shah gave written statements at the

---

[2] Officer Reichert testified that "rolling no" questions are a series of questions asked such as "Do you have large amounts of currency in the car?" or "Do you have any marijuana in the car?" According to Officer Reichert, the officer asks these questions to gauge reactions to the questions. It is a sign of deception if the person does not look at the officer and provide direct, precise "no" answers to each question.

police station. Mr. Shah later pleaded guilty to possession with intent to distribute cocaine and to possession with intent to distribute heroin.

## B. District Court Proceedings

Mr. Zambrana moved to suppress the narcotics removed from the vehicle, the statements made by Mr. Zambrana and Shah to the Collinsville Police Department, and any live testimony that Shah would have given at trial. The district court granted Mr. Zambrana's motion, and suppressed the narcotics, statements and testimony. The court concluded that Officer Reichert had probable cause to stop the car driven by Mr. Zambrana because the evidence that his car had crossed the white center line was uncontroverted and unchallenged. However, the district court also determined that Officer Reichert did not have reasonable articulable suspicion to detain the car for a canine unit sniff. The district court summarized thirteen factors that Officer Reichert had observed:

> (1) driver and passenger would not make eye contact with him; (2) driver's hand was excessively shaking when he handed the officer his driver's license and rental agreement; (3) vehicle was a rental car which drug carriers are known to use; (4) vehicle was rented by a third party not present in the car, which drug carriers are known to do; (5) passenger provided military identification as though he was trying to present a "good-guy" image which drug carriers sometimes do; (6) there was only one piece of luggage in the back seat that appeared to contain only a few items, and drug carriers usually travel with limited luggage; (7) the driver and passenger were making a

> trip from Maryland to California in only seven days, and drug couriers are known for "quick turn-around" trips; [(8) inconsistent stories given by driver and passenger as to purpose of trip]; (9) [sic] [passenger was] nervous when talking with Officer Reichert and crossed his arms and turned his head away whenever he was asked a question by the officer; (10) passenger would indirectly answer the officer's questions; (11) driver's incorrect answers regarding his criminal history; (12) driver would look away whenever the officer asked if he was transporting anything illegal; and (13) driver provided an excuse as to why he did not want the officer to search the car.

R.41 at 15. The district court noted that the proper test for reasonable suspicion is to evaluate the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 272 (2002). However, the district court discussed each factor individually, using language such as "standing alone, [the factor] means nothing in the reasonable suspicion analysis" and "[i]n isolation, [the factor] does not give rise to reasonable suspicion." *See* R.41 at 16, 18. With respect to factors one through four, seven through nine, eleven and twelve, the district court determined that, standing alone, these factors are insufficient to reach reasonable suspicion. Likewise, the court held that factor ten, Shah's disclosure that he was in the United States Marine Corps when asked if he had ever been arrested, did not "objectively indicate that criminal activity was afoot." *Id.* at 18. The court determined that factors five (Shah's presentation of a military identification), six (only one piece of luggage in sight in the back seat) and thirteen (Mr. Zambrana providing an excuse as to why he did not want the car to be searched) were not legitimate factors for an officer to consider in the reasonable suspicion analysis.

After discussing each factor, the district court determined that "[i]nnocent explanations apply to each of these factors even when aggregated as a whole." *Id*. at 20. The district court also expressed concern with the officers' interpretation of possibly innocent body language, noting that the police may have been "inappropriately acting as human polygraphs." *Id*. at 21. The district court believed that coincidences with a drug courier "profile" gave the police officer only a hunch—not the objective manifestation of reasonable suspicion needed to detain Mr. Zambrana's vehicle beyond the routine traffic stop.

The district court did not make any explicit credibility findings regarding the police officers who testified at the suppression hearing. However, the court did note that there was conflicting evidence regarding some damage on the side of the rental car. Officer Reichert testified the damage was on the driver's side, while a service receipt indicated that damage on the passenger's side had been repaired. The district court noted that this discrepancy was significant only "to the extent the contradiction calls into question Officer Reichert's ability to observe with accuracy." *Id*. at 2 n.3. The court also described Officer Reichert as a "polished witness." *Id*. at 14. As for the class that Officer Reichert teaches on pre- and post-stop indicators, the district court observed, "A skeptic regarding law enforcement, which the undersigned as a former police officer is not, might call Officer Reichert's class: 'How to avoid the warrant requirement in searching a vehicle.'" *Id*. at 14 n.8.

## II

## DISCUSSION

When determining whether a police officer had reasonable suspicion to stop an individual, the district court must evaluate the "totality of the circumstances" to assess whether the detaining officer has a "particularized and objective basis" for suspecting illegal activity. *Arvizu*, 534 U.S. at 273; *Kaniff v. United States*, 351 F.3d 780, 785 (7th Cir. 2003). Under this standard, a court cannot simply evaluate and reject each factor in isolation from the other factors. *See Arvizu*, 534 U.S. at 274. Rather, it must view the circumstances in their entirety and determine whether a reasonable officer would have believed that he had a "particularized and objective basis" for suspecting illegal activity. *Id.* at 273-74. The "totality of the circumstances" test necessarily includes the experience of the law enforcement agent and the behavior and characteristics of the subject. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). Police officers are entitled to make assessments of situations "in light [of their] specialized training and familiarity with customs of the area's inhabitants." *Arvizu*, 534 U.S. at 276.

The Government submits that, even though the district court recited the "totality of the circumstances" test, its opinion makes clear that it actually failed to undertake the inquiry required by this methodology. In the Government's view, the district court simply assessed each factor individually. It regards the district court's single sentence that "in the aggregate, these factors still have innocent explanations that do not constitute an objective basis for suspected legal wrongdoing" as an insufficient application of the "totality of the circumstances" test. Appellant's Br. at 35. In reaching this conclusion, the Government relies upon a case decided by our colleagues in the Sixth Circuit, *United States v. Orsolini*, 300 F.3d 724 (6th Cir. 2002). Appellant's Br. at 36. In *Orsolini*, the court of appeals determined that a conclusory statement made by the district court that

considered the defendant's nervousness "in conjunction with the other cited factors" was insufficient to show that the court actually had weighed all factors together. 300 F.3d at 728.

Mr. Zambrana takes a different view of the matter. He submits that the district court did employ the "totality of the circumstances" methodology in evaluating Officer Reichert's actions. Mr. Zambrana points out that the district court specifically cites the "totality of the circumstances" standard from *Arvizu* in the Memorandum and Order. Appellee's Br. at 8. Mr. Zambrana also emphasizes the district court's conclusion that, in the aggregate, the factors still have innocent explanations that do not constitute an objective basis for suspected legal wrongdoing.

The Government makes an additional argument. It submits that the district court failed to evaluate the factors from Officer Reichert's perspective and experience; instead, continues the Government, the district court substitutes its own view of the significance of the factors. For example, the district court reasoned that Mr. Zambrana may have lied about his arrest record in order to avoid a traffic ticket. This view, notes the Government, contradicts the officer's testimony that, based on his experience, most individuals do not downplay their arrest record. The Government also contends that the district court substituted its own view for Officer Reichert's testimony and experience with respect to the significance of the following factors: (1) that the vehicle was a rental car; (2) that the passenger provided military identification to try to present a "good guy" image; (3) that there was only one piece of luggage in the back seat; (4) that Mr. Zambrana and his passenger were traveling from Maryland to California in only seven days; (5) that inconsistent stories were given by the driver and passenger; and (6) that the passenger indirectly answered questions.

Mr. Zambrana does not dispute that the district court disagrees with Officer Reichert's use of several of the above factors as indicators of suspicious activity. Rather than characterize the district court's opinion regarding several of the factors as the substitution of its own opinion for that of the officers, he describes the factors as "credibility determinations about the testifying officer." *Id*. at 11.

In reviewing a district court's determination with respect to reasonable suspicion, we scrutinize de novo the district court's ultimate determination with respect to the existence of reasonable suspicion. *Arvizu*, 534 U.S. at 275. The Supreme Court has made clear that the purpose of de novo review is to permit us to ensure uniformity of decisions among the different districts in the same circuit. *See id.* When reviewing determinations of reasonable suspicion, we must come to a "common sense conclusion" as to whether the facts to which the officer points reasonably would raise a suspicion of wrongdoing. *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997). This process requires that we "give due weight to the inferences drawn from [the historical facts] by resident judges and local law enforcement officers." *United States v. Ornelas*, 517 U.S. 690, 699 (1996); *see also Arvizu*, 534 U.S. at 276.

Although the considerations noted above require that we review de novo the district court's ultimate determination as to the existence of reasonable suspicion, our institutional role in that respect in no way eclipses the crucial role played in this adjudicatory process by our colleagues on the district court. Vital aspects of the overall determination of the reasonable suspicion issue are the prerogative and responsibility of the trial court; it has the institutional capacity to make findings of historical fact as well as all-important credibility judgments. The superior institutional capacity of

the district court to deal with these matters is acknowledged in the rule that we shall review the district court's determinations of fact only for clear error. *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). Indeed, although the ultimate decision is subject to de novo review in this court, the district court's estimation as to whether reasonable suspicion existed is an important step in the process and a determination worthy of our great respect. A United States district judge brings to such a determination both pragmatic wisdom and fierce impartiality. Consequently, the judgment of that judicial officer, even when reviewed de novo, must be given thoughtful and serious consideration by those of us who are bound by the cold record.

It goes without saying, of course, that, in assessing the evidence presented by law enforcement officers, a district court should be mindful of the officers' experience, their training and the pressure-filled circumstances under which they fulfill their duties. On the other hand, in the final analysis, it is the responsibility, and prerogative, of the court to make critical judgments as to the constitutional appropriateness of the officers' conduct and judgment. Although the officers may be seasoned in the practical exigencies of law enforcement, the United States district judge is expert in the requirements of the Constitution, and it is the standards of the Constitution that must prevail.

With these principles in mind, we believe that several factors counsel against definitive resolution of the issue before us at this time. First, despite the plenary hearing conducted by the parties and the careful examination of each factor relating to reasonable suspicion by the district court, we remain uncertain as to whether the district court, although articulating the "totality of the circumstances" methodology, actually evaluated the situation from this

perspective. Just as importantly, the district court's laconic statement about the "totality of the circumstances" test does not provide us with the sort of explanation that will permit us to benefit from the court's wisdom and experience in making our own evaluation.

We also find ourselves handicapped by another aspect of the district court's treatment of this issue. The district court's opinion suggests that the court found Officer Reichert a less than completely satisfactory witness. The district court is entitled—indeed has the responsibility—to make credibility judgments and to otherwise determine what weight ought to be given to particular testimony. After studying the opinion of the court, we remain uncertain as to the district court's view on these matters. A more explicit statement in this regard is necessary to our own evaluation.

Accordingly, we must vacate the decision of the district court and remand the case to permit that court to provide these explanations that, as we have noted, are vital to our decision. We appreciate that the district court faces a great workload and has great demands on its time and attention. However, we are sure that the court also appreciates that the pendency of the underlying criminal action makes it imperative that the necessary decision be made expeditiously.

Finally, we stress that our decision today ought not be construed as an indication of any inclination on our part of the ultimate merits of the question presented. We simply need to ensure that we are fully informed before making a ruling on this matter.

## Conclusion

The decision of the district court is vacated, and the case is remanded for proceedings consistent with this opinion. If, after the district court completes its work, a new appeal on this issue is taken by the Government, the Clerk will treat that appeal as successive to the present appeal and return the case to this panel.

IT IS SO ORDERED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*